Ms. O'Malley Good morning, Your Honors, Counsel. May it please the Court, there are three primary issues that arise from the lower court's dismissal of this matter on the pleadings. The first issue is whether or not plaintiffs have adequately pled a retaliatory adverse act under Title VII of the Civil Rights Act and the Illinois Human Rights Act. The second issue is whether or not plaintiffs have adequately pled causation under both of those acts. And the third issue arises under the Illinois Whistleblower Act and is an issue related to whether or not plaintiffs have coverage or are covered employees under that act. It's important to keep in mind that this is a pleadings case. There is no evidentiary record before the Court and it is not our job here today to weigh evidence or even competing assertions between the parties. It is the job here today to determine whether or not the pleadings have adequately set forth the retaliation claims. The core allegations in the case are rather simple. Kurtz Paramedic took over a subcontract to jointly operate the Antioch Rescue Squad and employ its EMTs. Both of the plaintiffs were EMTs with the Antioch Rescue Squad for several years and both had been engaging in protected activity under both Title VII and the Illinois Whistleblower Act for several months. The protected activity included egregious violations of sexual harassment as well as the EMS Act and patient misconduct. And those allegations were brought forth by both of those plaintiffs in various forms including in the Northern District of Illinois Court, before the Illinois Department of Public Health which initiated an investigation, before the Antioch Police Department, and before Village of Antioch meetings. The plaintiff's protected activity of that variety continued through the time that Kurtz came in to take over the subcontract. How long did the process take for whatever discipline was going on before they transferred into Kurtz? The issue in this case does not involve discipline. I know, I know. I'm just wondering. Obviously there was something pretty serious going on that required all of this investigation. That pretty much started this whole investigation was filed in the late summer or early fall of 2011 by Plaintiff Shannon Bowling in this case. Plaintiff Alan Springer submitted a declaration in support of that lawsuit and both of them, the Illinois Department of Public Health investigation was initiated in October of 2011. But through that time, both of the plaintiffs continued to engage in protected activity. And importantly, your honors, Kurtz Paramedic was not involved in any way, shape, or form throughout any of that time until at the earliest May of 2012 when it first began, as pleaded, discussing entering into a contract with Antioch Rescue. So the first time that Kurtz would have had the opportunity to learn of the protected activity would have been approximately at best one month before they made the deliberate choice to offer continued employment to every single one of the other EMTs who had not engaged in protected activity, except for the two plaintiffs who had. How many EMTs were in this squad, I guess you'd call it? So the squad has the paid EMTs that work in the daytime under the subcontract. The daytime employees have eight EMTs who are employed by the subcontractor. Previously, it was a Metro Paramedic on June 15th. On June 16th, that number went down to six. And under Kurtz Paramedic, who only hired all but the two whistleblowers. They hired four then? I'm sorry, no. It went from eight minus my two plaintiffs to six. So Kurtz hired six. Correct. They hired everybody except for the plaintiffs in this lawsuit who were the only two whistleblowers. So, Your Honors, we submit that the allegations of retaliation are palpable. This is notice pleading. We have certainly given Kurtz notice of the claim, retaliation, and the basis upon which it's. So their notice, Ms. O'Malley, is to be presumed because of the one month that they had negotiations before they took over as the daytime paramedics. So they're aware of the plaintiff's existence? Certainly. And they also conceded, the manager for Kurtz, the hiring manager, conceded that she was aware of the Voling lawsuit at the time before the hiring decisions were made. We have also pled extensively in the complaint that this lawsuit, well, as an initial matter, it's reasonable to infer that when you're about to enter into a subcontract, especially one that carries an indemnity, that you would do a little bit of due diligence to look up the entity that you are entering into a contract with. And it's also reasonable to infer that Antioch Rescue would, of course, inform Kurtz, hey, by the way, we have this big federal lawsuit, and the Illinois Department of Public Health is actively investigating us. In fact, June 4th was the first time that the Illinois Department of Public Health issued a notice of revocation for one of the licenses of the EMTs. The contract between Kurtz and Antioch Rescue was entered into 11 days later. So it is very plausible to infer that, of course, they would be aware of this. And additionally, we also pled that these allegations were all over the news media in Lake County, and a simple Google search would have popped up multiple news stories that named plaintiff Voling. But with regard to causation, if you're asking about causation, causation at the pleading stage can always be inferred. Importantly, this court in the Lovano v. Walmart case has expressly rejected any suggestion that there's a heightened pleading of causation at the pleading stage, because causation can be inferred even where a defendant expressly denies awareness, even where a defendant expressly denies that the reason for the adverse act was the protected activity. Causation can be inferred from circumstantial evidence by the jury. Here we have, I think the biggest elephant in the room is the incredibly dubious coincidence that it was the two plaintiffs alone who were left behind. It would obviously be incredibly unreasonable to make an inference, and impermissible to make an inference for the defendant, that this profound coincidence that it was just the two whistleblowers left behind was benign. Well, no, there's a revocation of an EMT. Who was that? This was somebody unrelated to the case. It was one of the EMTs who had been working for the Antioch Rescue Squad. He also did also work for the prior subcontractor. Was he the guy that was causing a lot of the problems? He was the bad actor in the underlying case, and he was also employed by Kurtz's predecessor, Metro Paramedic. So Kurtz has a very keen motive to make sure that these two whistleblowers stay the heck out of their workplace, because they had been making allegations against the predecessor subcontractor's employees. Was there anyone besides the guy that was suspended, any other members of the EMT that were involved and otherwise detrimentally affected? The chief of the squad had a notice of license revocation. Three other employees had a notice of license revocation. The squad itself was placed on probation by the Illinois Department of Public Health, and they were sanctioned and fined. So there was multiple, multiple ramifications and consequences to the squad, which is why I state that it would be very unreasonable to infer that the squad wouldn't be forthright with somebody who was going to take over the subcontract. Well, Kurtz obviously didn't want any of those other people, right? They, in fact, took everybody under the subcontractor except for the whistleblowers. Well, I know that. Yes, there were people. Well, when you say everybody, but there were a lot of other people who were, whatever, suspended. You named, just named, didn't name their names. You just mentioned several other people who were with, what's the name, whatever. Metro, the prior. Yeah, Metro. Right. Kurtz took every single person who was with Metro except for the whistleblowers. They did, in fact, at this point in time. They didn't take the people who were. The bad actors. Some of the bad actors. Had their license revoked or had other problems. I don't know. Was suspended. Whatever happened. They didn't take any of those. Yes, they did. Well. You only took six. The people with the license revocations, some of those didn't, some of the license revocation notices didn't come out until after Kurtz had taken over the subcontract. There was only one. Some of the ones they took over had their revoked? I'm sorry? Did any of the six that came in have something revoked? No, but some of the six were named in the underlying lawsuit as bad actors. Specifically, the supervisor who was the joint supervisor of the squad and the joint employer on the daytime shift. She had been implicated in the underlying lawsuit, and she was retained with the six. And so the issue that faces your honors today is simply whether or not the plaintiffs, well, there's three issues, as I mentioned. But whether or not the plaintiffs have pled a retaliatory act, and as this court and the Supreme Court have recognized over and over and over again, the ultimate issue in any Title VII case is discrimination vel non, or in this case, retaliation vel non. The courts have soundly rejected from the Supreme Court through this court over and over any attempt to adhere to rigid formulaic elements of a cause of action. And in this case, Kurtz relies entirely in attacking the complaint on the retaliatory act on a rigid formulaic element of a cause of action. This harkens back all the way to Teamsters. The Supreme Court of the United States set forth that there can be relief in a case to non-applicants where the application would have been futile. This court in Lloyd, recognizing this principle from Teamsters, stated that what matters is the factual setting of a dispute, not an abstracted formula intended to be all things to the case. They said, the Lloyd court said, if the plaintiff alleges that the employer's decision not to approach people of her status was itself illegitimately motivated and shows that but for such a practice, she likely would have been approached, then all she must do to complete the chain of causation is establish that had she been approached, she would have taken the job. We have pled all of that. We have pled that there's a closed application process. They didn't approach anybody except the secret six that they approached behind closed doors, that there was no notice posted in the station, not online, not in a newspaper. They went to these people individually. They did acquire the contact information of the two plaintiffs in this case, but they made a deliberate choice, Kurtz, made a deliberate choice not to contact the plaintiffs, not to interview them, not to hire them, and to, in fact, conceal the employment opportunity from them. That is a retaliatory adverse act, both under the Teamsters-Lloyd-Fisher line of cases. It is also a retaliatory adverse act under Burlington Northern, which is the seminal case that sets forth the standard for retaliatory acts, which is broader than that for a discriminatory act. Importantly, Burlington Northern states, we phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. The court said context matters. Counsel? Yes. Was there a reduction also in force? In other words, that they hired the six. Did they hire another two to make the eight complement fill, or they just went forward with six employees? Those facts are not on the pleadings, and those facts would be facts that we would, of course, seek in discovery of the litigation. The issue before the court is, of course, whether or not we have an outage. Ms. O'Malley, did the plaintiffs ask for their jobs on the 16th after this happened? Well, the plaintiffs weren't. The way that this happened is that the employment decision was announced, and it was already made. And I understand that the defendants – No, no, I'm just asking. Maybe I'm asking you to go beyond the pleadings. Sure. Did they then go to Kurtz or the chief or the squad manager and say, hey, what about us? Well, they didn't go because they, at this point, had been experiencing a lot of retaliation, and the decision was final as far as it was announced, and they were not given that opportunity. I will say that I spoke with Kurtz's counsel. We filed the EEOC charge about two weeks after this happened, and I spoke with Kurtz's counsel, and I offered him the opportunity to demonstrate that Kurtz was not involved in this decision, to share with me the communications, the e-mails, and, you know, as I'm not in the business of suing people who aren't complicit. He elected not to do that, and at no time did Kurtz ever, you know, then in connection with discovering that the plaintiffs weren't happy about this, go to them and say, oh, I'm so sorry. This must have been a huge mistake and a mix-up. By all means, you can keep your jobs. They were the only two who were actively prevented from keeping their jobs, which is the retaliatory act that excuses the application in this case, and they were the only two who lost their livelihoods because the failure to interview them and retain them and to offer them this employment resulted in both of the plaintiffs losing their jobs that they had held in the communities in which they worked and lived for several years. I will just, I see that into my rebuttal time, and I will just briefly mention under the IWA, there is no definition, there's no express inclusion or exclusion of applicants or prospective employees. The Supreme Court of the United States in the Robinson v. Shell Oil case tells us that where an act is silent, and in the Robinson case it was Title VII, but has a broad remedial purpose like the Illinois Whistleblower Act, that the courts should construe that to give meaning to the act, and in the Robinson case that said, well, Title VII doesn't say former employees, we get that, but of course it needs to be construed to apply to former employees. Here, it needs to be construed to apply to prospective employees. The Illinois Appellate Court in the Carter Cole v. Human Rights Commission case, which wasn't an interpretation of coverage, but made a very strong declaration in relation to an employee who had been retaliated against for having engaged in protected activity against a prior employer, and the court said, yes, this is a cause of action, because if filing a claim meant that an individual would have great difficulty in obtaining another job, the exercise of basic statutory rights by employees would be more than chilled. It would be frozen. That is particularly the case here, and applicable here, where the Illinois Whistleblower Act prohibits retaliation, whether within or without of the workplace, clearly contemplating that applicants can and should be covered. And with that, I will reserve, we would ask that the court reverse and remand, and respectfully to remand pursuant to Circuit Rule 36 to give us a fresh start, and I will reserve the remainder of the time. Thank you. Thank you, Ms. O'Malley. Ms. Kohlross? May it please the court. Counsel. Melinda Kohlross on behalf of the defendant, Apolli, Kurtz Paramedic Service. The district court correctly dismissed plaintiff's amended complaint against Kurtz, and we respectfully request that that decision be affirmed. No court in the country has recognized a retaliatory discharge, a retaliatory failure hire claim absent any relationship or any communication whatsoever between the plaintiff and the defendant as is alleged in this case. Counsel, is it defense theory that this was just a coincidence? It's a coincidence, if you would call it that, that the plaintiffs did not apply. The plaintiff has alleged something very close to the Lloyd case, that is, a closed application process. I understand it hasn't happened in this kind of wholesale transition of employees from one contractor to another before, but given the purposes of the Lloyd flexibility and the purposes of the retaliation provisions, why shouldn't we apply the rules to these facts? Well, the Lloyd case is far different. First of all, that's a failure to promote, not a failure to hire. Why should that make a difference? Well, it makes a difference because these plaintiffs were unknown to Kurtz. Really? Yes. There was no work relationship. Kurtz came onto the scene. How did Kurtz find out about the other six? Because ARS told them about the other six. And not about the other two? There is no allegation here that Kurtz learned anything about these plaintiffs other than the fact that there was a lawsuit filed by Volling. Kurtz did not know that these plaintiffs were interested in continuing employment. And there's good reason why they might not be. If you know the allegations of the Volling lawsuit, there was discriminatory. But they didn't ask. They didn't ask. Kurtz didn't ask. We didn't ask, but it's not our obligation as a prospective employer to seek out people who might be interested in pursuing employment with us. There was nothing preventing the plaintiffs. Counsel, what do you think the purpose of requiring applications in the usual cases? I think the purpose is to provide the employer with the opportunity to make a decision whether they would interview the applicant and upon interviewing whether they would hire. There's no allegation in this complaint, in the amended complaint, that Kurtz would have refused to interview these plaintiffs or that Kurtz would have refused to hire these plaintiffs if they had presented themselves as interested in employment. I'm trying to picture this case, a variation. Let's suppose of the eight employees, six are Caucasian, two are African American, and Kurtz invites only the six Caucasian employees to apply and leaves out the two African Americans. Would that give you pause? Well, I have two questions. Number one, did the African Americans apply or give any indication of interest in employment? Same facts, counsel. If the answer is no. Same facts as alleged here, closed application process. I'm going to go on to the next factor and say, was the prospective employer aware that they were African American? If they're not aware, then how could there be any question about discrimination? We do have an allegation here of knowledge of the litigation and, therefore, the complaints and protected activity, right? But there's no allegation of protected activity with respect to Kurtz. No, but with respect to Antioch, of course not with respect to Kurtz. But there's an allegation that Kurtz knew about the protected activity with respect to Antioch, right? Well, that they knew Valling had filed a lawsuit. So Kurtz knew that Valling had filed a lawsuit. They know nothing else. In Lloyd v. Phillips, the plaintiffs were women who worked at this, I believe it was a bookbinding factory, and the management there went to all the male employees and said, you're the next one to receive the promotion, you're the next to receive the promotion, you're the next to receive the promotion, and left the plaintiff woman out of that mix. That is a far different situation than what we have presented here. The plaintiffs never presented themselves to Kurtz in any way indicating they desired further employment. And to put the onus. When did they have that opportunity? They had the opportunity at the latest as soon as they learned of Kurtz's identity. And that had to be. Which was when? Well, they lost their jobs when their metro contract expired on June 15th. Kurtz hired the six other EMTs on June 16th. At no time in the two years between June 16th when that hiring decision was made and when their complaint was filed in this action did the plaintiffs ever approach Kurtz and inquire about employment, ask to be interviewed for employment, apply for employment, or otherwise indicate that they wanted to continue as EMTs under the Kurtz subcontract. Who made the decision about whom to contact about employment with Kurtz? ARS told the other six EMTs how to apply with Kurtz. They gave those other six EMTs the information, said contact this person who's the hiring manager, do these things to apply. There's no allegation that Kurtz knew that ARS did not provide that same information to these two plaintiffs. No allegation of that. Only ARS advised the six EMTs and ARS chose not to advise the plaintiffs about how to apply with Kurtz. So that cannot be pinned, the blame for that cannot be pinned on Kurtz. And that's one of the big problems here. The plaintiffs are trying to, through their allegations, put Kurtz in the same box as ARS and or Metro, and that's not plausible here. We were a newcomer to the situation. We had nothing to do with the prior bad acts or the prior bad actors. The plaintiffs sued and recovered from ARS and Metro for the alleged discrimination below. Did Kurtz know that there had been eight and that only six applied? There's no allegation to that effect. So, no, there's nothing alleged. There's nothing alleged in the complaint. There's nothing of record that Kurtz knew that there were eight and then they only had contact information for six. For all they knew, there might have been 10 or 12. The employer in this situation, think of the ramifications. If you're going to impose on the employer the duty to inquire with any former employee, hey, would you like to come work for me? Was Kurtz aware of any of the problems that ARS had before about the suspensions and investigations and other things? I believe they were aware of the volleying lawsuit, so they knew that there was discrimination going on previously. Because there was publicity about that? There was publicity. It's unclear whether Kurtz knew of that publicity, but Kurtz's whole reason they were brought in to take over after Metro was terminated was because there were these problems. In fact, it was their opportunity. Kurtz received an opportunity to gain employment because Metro was being fired. Well, I assume these people were needed. I assume they had to have a certain number of EMTs or whatever. I assume that that's correct. And I had never understood about how this volunteer on weekends versus being employed. Well, apparently the squad did function, that the weekend and nights were unpaid volunteers. I really don't understand that. But that's beside the point. Yes. And what I'm really trying to clear up is just I don't want to go what did they know and what did they know what. But I really am concerned about what they should have known or when you'd have any hiring decision when you hire six people. But I assume when they hired these six people, they had additional work for those people. Well, there's nothing alleged in the amended complaint. And you recall the plaintiffs were given an opportunity to file an amended complaint, which they did. There's no allegation that additional people besides other than the plaintiffs were hired. They said the hiring decision was made. These six were hired. The two plaintiffs were not. And isn't that a dubious coincidence? But it's not. Six people applied. Six people were hired. Did Kurtz have other employees? That worked for ARS. It's not alleged. No. But Kurtz went forward. I'm just interested. There's nothing alleged in the amended complaint about that. The sole allegations are six former Metro employees applied. Six were hired. The two plaintiffs did not apply. The two plaintiffs were not hired. Yeah, but normally you apply to a company that you know exists and needs EMTs as opposed to a company that is newly formed. Well, Kurtz wasn't a newly formed entity. Oh, I'm sorry. I misunderstood your question. Kurtz wasn't a newly formed entity. They were just the new subcontractor. Okay, but they did this kind of work. Yes, they were a staffing agency for a medical ambulatory provider. Okay, so it's strictly a staffing agency. They're a staffing agency, right. They're a service provider, apparently well-known because they could have been found on a Google search. As soon as the plaintiffs lost their job and the ARS continued, they knew somebody else had come in. They had to have some affirmative obligation to inquire who came in and to contact that entity and attempt to find out whether they could interview, whether there were more openings, whether there was an application process. The fact that ARS might have hidden Kurtz's identity from them for a day between the time their contract had ended and the hiring decision is through no fault of Kurtz, and they had an affirmative obligation at some point to contact us. We did not need to go seek them out. So did Kurtz invite applications at some point? They invited applications. They entertained applications. They contacted, they brought in these people for interviews. No, no, no, no, no, beyond simply the names that Antioch referred to them. There's no allegations of that in the complaint. Do we know whether Kurtz went forward with eight people or six or more? There are no allegations in the complaint. The complaint is restricted to six people applied, six people were hired, two people did not apply, two people weren't hired. That's it. That's the totality of the allegations. And, again, this court needs to decide is it Kurtz as the prospective employer's obligation to seek people out and say, would you like to apply? Counsel, it sounds like Kurtz just delegated the transfer process to Antioch, and under circumstances where that seems especially odd, given that Kurtz was supposed to come in and clean up the operation. I would not say they delegated it. I think Kurtz's thought process was the fastest, easiest way to staff positions is to take people who've already worked for ARS, which is a sensible approach. And one would think that would apply to everybody. Right. Kurtz, there's no allegation that Kurtz knew that everybody wasn't included. They didn't know that ARS did not inform the plaintiffs of the opportunity. Ms. Coloss. Yes. Ms. Coloss, is it not reasonable to assume that Kurtz, as the new subcontractor, would find out from Antioch what the size of the force is? I mean, they didn't know whether the negotiations to take over from Metro. They would have to know whether it was 22, 8, 6. I mean, do you think there was notice? The way staffing was done, especially since in this amended complaint, there are allegations that some of the retaliation against plaintiffs were reductions in hours. It's entirely possible that a force of six was sufficient to cover these day shifts. If the force of six was sufficient, then they didn't need to go beyond and say, are there more people? Can we get more people? So there's no allegation. The record is silent on that. If they had enough to proceed with six, again, did we have an obligation to go beyond that and try to get other people to apply? And this would be the first case that we are aware of in the nation to impose that burden on an employer such as Kurtz. So we respectfully request that the decision of the district court dismissing the amended complaint be affirmed. Thank you, Ms. Coloss. Ms. O'Malley. Two minutes. Thank you, Your Honor. Counsel keeps saying that there are no allegations that Kurtz knew of plaintiffs or that they weren't included, but paragraph 61 of the complaint states, at the time that it asked ARS for the contact information, defendant Kurtz was aware that plaintiffs Voling and Springer were former Metro employees and that they were aware of the Voling lawsuit. Paragraph 65 of the complaint says, defendant Kurtz did not consider any other candidates for the position of EMT besides the Metro employees. As its hiring manager conceded, quote, she felt that contacting employees who already had experience working with ARS would be helpful and allow her to fill the positions quickly. The other allegations in the complaint, and I apologize, I don't have that. That paragraph, sorry, handy, is that defendant Kurtz knew of them. They elected not to contact them, the plaintiffs. They elected not to hire them, not to interview them. The issue that we're really discussing here today is one of standing. This is what Teamsters recognizes and it's what Lloyd recognizes. It is, is there a natural applicant pool? In Teamsters, the individuals did not apply for the jobs. The court said they are still entitled to relief because they were in the natural applicant pool. They also discussed the concept of futility, that you don't have to go chasing around and seeking an opportunity that is clearly closed to you. And there was some discussion of that. The Lloyd case said, you know, Sandra Lloyd did not apply for the job. And the Lloyd case said that the same argument was made, that she had to, like the counsel argues here, find out who they were, discover somehow, some way, and then that there was an open, that there was an application going on, and then insert herself into a process that she wasn't invited to. The Lloyd case said, Lloyd wonders why she should be required to actively pursue a promotion when her male colleagues are not. So do we. And that's the issue here. The plaintiffs have standing to make this retaliation claim because they were in the natural applicant pool. There was exactly eight people. Was that the total? Should that be the pool looked at? Not all the possible EMTs in the county? Well, certainly. I mean, I think best practices would have warranted, if they're coming in to clean up a squad, that they would have posted this opportunity to, you know, all of the EMTs in the general area. But their choice not to raises an inference in this case that they actively concealed this from the plaintiffs alone because it was the plaintiffs and plaintiffs alone who were left behind. In the Teamsters case, this is exactly what happened. The applicants had the standing and were entitled to relief. So Kurtz did know of all eight, and they made a deliberate decision, and there are consequences for that decision. And today we're only here to decide whether or not the plaintiffs have raised the specter that it's plausible that Kurtz made this decision to leave the plaintiffs alone out for the purpose of retaliating against them and making sure that these whistleblowers didn't join the rest of the current employees. They were the only ones not moved over. And even the supervisor of the squad said she found it highly suspect, highly questionable were her words, that only the plaintiffs and only the whistleblowers were the ones not moved over. To use your words, you said something about to clean up this squad. Well, counsel had referenced in her argument that Kurtz was brought in here specifically to be a fresh start because of all of these problems the squad was having with the Illinois Department of Public Health investigation and the lawsuit. So if Kurtz was really earnest in wanting to get this fresh start, it seems highly suspect that Kurtz would say we're only going to take, of the eight employees you have now, we're going to take all of them except for the two who actually were the ones saying, hey, hey, clean up this squad. We want to report these things that we see that are going on. Well, they weren't going to take others, I assume, as part of a squad that needed cleaning up. But you say this. They did. They took. You say they did took some risk people, in other words. Yes. There were only eight people working under the prior subcontract. I see. So the six were not all clean, as you say. That's correct. But the two who would have been, actually, if Kurtz was earnest in wanting to clean up the squad, it would seem to me that they would want the two whistleblowers there because it was the whistleblowers who were actively participating in the investigations and bringing these issues to light. Counsel, you settled with Antioch. Is that right? We did resolve the matter with Antioch Rescue. Thanks. Thank you, Your Honors. Thank you. Thank you, both counsel. The case is taken under advisement.